In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Nos. 10-1974 & 10-2064

ANDY THAYER, et al.,

*Plaintiffs-Appellants,*

*v.*

RALPH CHICZEWSKI, et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 1:07-cv-01290 & 1:07-cv-01406—**John W. Darrah**, *Judge.*

ARGUED APRIL 6, 2011—DECIDED SEPTEMBER 18, 2012

Before FLAUM, EVANS*, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.*  Chicago police officers arrested plaintiffs for disorderly conduct at a 2005 antiwar demonstration at the corner of Chicago's Oak Street and Michigan Avenue. The plaintiffs brought claims for First Amend-

---

* Circuit Judge Terence T. Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

ment retaliation, Fourth Amendment false arrest, Fourteenth Amendment class-of-one equal protection, and state law malicious prosecution. They also brought facial challenges against subsection (d) of Chicago's disorderly conduct ordinance, Chicago Municipal Code, Ill. § 8-4-010(d) ("subsection (d)"), as overbroad and unconstitutionally vague.[1] (The suits were initially assigned to separate district judges but were subsequently reassigned to a single district judge.) The district court granted summary judgment and we affirm on the basis of qualified immunity.

The district court dismissed Bradford Lyttle's facial challenge for failure to state a claim and ruled that Andy Thayer's facial challenge was barred by res judicata. Thayer doesn't appeal that ruling. The district court granted summary judgment on the plaintiffs' remaining claims. We affirm the grant of summary judgment in favor of the defendants; we do so, however, on the basis of qualified immunity. Lyttle's facial attack on the ordinance is rendered moot by our recent opinion in *Bell v. Keating*, No. 11-2408, 2012 WL 3892506 (7th Cir. Sept. 10, 2012), which partially invalidated subsection (d) on overbreadth and vagueness grounds. While we are sympathetic that the plaintiffs' arrests under a now-invalid ordinance may have affected their free speech rights, they did not bring an as-applied challenge (for seemingly cognizable reasons) to redress such an injury.

---

[1] The suits were initially assigned to separate district judges but were subsequently reassigned to a single district judge.

## I. Background

Andy Thayer is a prominent Chicago activist. He has played a leading role in organizing antiwar protests in Chicago since at least 2003 and is well-known to many Chicago police officials, including Officer Ralph Chiczewski, Deputy Chief of the Central Control Group for the Chicago Police Department (CPD), and Officer John Killackey, Deputy Chief of Area 1 Patrol for CPD. Thayer is a leader of the Chicago Coalition Against War and Racism (CCAWR) and on behalf of this group, helped plan a protest on March 20, 2003, where 5,000 to 10,000 demonstrators gathered at Federal Plaza to protest the invasion of Iraq and then marched through the city. This march led to the mass arrests of several hundred protestors and was the subject of our decision in *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011), where we held that a question of fact existed as to whether police had probable cause to make those mass arrests. Thayer has had extensive adversarial dealings with the CPD as a result of his activism. The CPD has covertly infiltrated Thayer's anti-war meetings, and in doing so, noted the group's anti-war and anti-Chicago police sentiments. Lyttle is also a long-time activist. Both have been arrested numerous times for protest activity.

On January 3, 2005, Thayer and CCAWR applied for a permit to lead an anti-war march on Saturday, March 19. They sought permission for 2,000 to 4,000 people to gather at the southwest corner of Oak and Michigan at noon, then march to Federal Plaza via Michigan Avenue, Randolph Street, State Street, and Adams Street. In front

of the building at Oak and Michigan is a small plaza area and a wide sidewalk. This desired location for the march is at the heart of an area known as the Magnificent Mile, containing many of Chicago's major upscale hotel, retail, dining, and commercial establishments; in addition to being the site of a great deal of commercial and retail activity, it is one of Chicago's most active tourist destinations.

The city denied the application and offered an alternative assembly point at Washington Square Park, which is three blocks west and one block south of Oak and Michigan, and a parade route down Clark Street and Dearborn Street to Federal Plaza. Thayer did not accept this alternate site. He instead appealed to the Mayor's License Commission; after a two-day hearing, his appeal was denied. The Commission found that Thayer's proposed route would unduly disrupt pedestrian and motor traffic, adversely affect businesses in the area, impede ambulance traffic and bus routes, and require an unjustifiable level of law enforcement.

Thayer and CCAWR filed a complaint in federal court seeking to compel the city to grant the permit; after another two-day hearing, the district court denied the motion on March 11. On March 14, the CPD sent Thayer a letter stating that it wished to accommodate marches by allowing an assembly and march at the proposed alternate location. The CCAWR subsequently obtained a permit for a rally at the Federal Plaza.

In the week before March 19, the city posted a notice on the CPD's website directed to demonstration partici-

pants. The notice informed them that no permit had been granted for an assembly at Oak and Michigan and offered the alternative assembly point for the march and rally at Federal Plaza. The notice warned that any assembly or march at Oak and Michigan was illegal. Thayer saw the notice prior to March 19.

Thayer and CCAWR, however, continued to publicize Oak and Michigan as the assembly point for the March 19 demonstration through its website and flyers. On March 15, they disseminated flyers and an email declaring "Lack of Permit Won't Stop Anti-War Protest," urging protesters to assemble at Oak and Michigan. The flyer stated that "March and Rally for Civil Liberties at Home and Self-Determination Abroad, on the 2nd Anniversary of the Iraq War." It then stated:

> Saturday, March 19
>
> Noon: Oak St. & Michigan Ave., Chicago [There is not a permit for this assembly point and march]
>
> 2 PM: Federal Plaza, Adams & Dearborn [There is a permit for this rally]
>
> . . . .

(Doc. # 176-7) (brackets in original). The flyer informed protestors that "it IS possible that police will arrest people assembling at Oak and Michigan if the cops give an order to disperse and people do not leave." The flyer continued, "[f]or those who . . . cannot risk arrest . . . protest organizers note that the 2 pm rally at Federal Plaza was granted a permit . . . ." *Id.* The flyer also stated that "[t]he police can still change their minds and allow us to march down Michigan Avenue . . . ." *Id.*

At some point in the week, when it became clear that the CPD wasn't going to change its mind, the CCAWR decided to hold a "press conference" on the sidewalk at noon instead of an assembly. A media alert prepared in part by Thayer in the week before March 19 called the gathering at Oak and Michigan "an informational rally" and a "press conference." The CCAWR also took other efforts to publicize its decision to hold a "press conference;" the city still threatened arrest if protestors came to Oak and Michigan that day. Thayer wanted to announce his message that the city was unfairly opposing his efforts to organize a march and speak out against the war. He testified that the "press conference" was called to inform people that the march down Michigan was canceled, to encourage people to proceed to the permitted rally at the Federal Plaza, and to communicate their view that the city had violated their First Amendment rights by denying the permit at Oak and Michigan. However, the CCAWR website as of Friday, March 18, made no mention of CCAWR's decision to instead hold a "press conference" at Oak and Michigan.

On the morning of March 19, Thayer attended an event in front of the Cardinal's Mansion on North Avenue. Officer Chiczewski was there informing the protestors of the permitted assembly point at Washington Square Park. He told Thayer, "if you show up . . . at Oak and Michigan, you will be arrested if you even appear." Thayer told Officer Chiczewski that it was a press conference, not a rally, and that he would be on the sidewalk, not in the street, but Officer Chiczewski

insisted that he "would be arrested if [he] so much as showed up at that corner." (The content of the conversation is disputed, but on summary judgment we construe the facts in favor of the non-movant.) Officer Chiczewski said the CPD was worried about the size of the crowd assembling at that location and then walking over to the rally at Washington Square Park. Such a large mass of people, according to him, could disrupt pedestrian and vehicular traffic. Officer Chiczewski testified, however, that depending on the circumstances, no permit was needed to assemble and hold a press conference at that location.[2]

---

[2] Under the Chicago ordinances governing demonstrations, a permit is required for a "parade," Chi., Ill., Mun. Code § 10-8-330(b) (2004), defined as "any march, procession or other similar activity consisting of persons . . . upon any public street, sidewalk . . . which requires a street closing or otherwise requires police officers to stop or reroute vehicular traffic because the marchers will not comply with normal and usual traffic regulations or controls." *Id.* at § 10-8-330(a)(1). The ordinance doesn't require a permit for a "public assembly" meaning "a company of persons which is reasonably anticipated to obstruct the normal flow of traffic upon the public way and that is collected together in one place, or . . . any organized march or procession of persons upon any public sidewalk that is reasonably anticipated to obstruct the normal flow of pedestrian traffic on the public way, but which does not meet the definition of parade . . . ." *Id.* at § 10-8-330(a)(2). A person planning a public assembly, however, is required to notify the commissioner of transportation, at least five business

(continued...)

Officer Killackey, as the officer in command, arrived at Oak and Michigan in the morning. Around 10:00 a.m., before a crowd had gathered, officers posted signs and handed out copies of an announcement, much like the notice on the CPD website, explaining that there was no permit for an assembly or march at that location and informing protestors of the alternative site at Washington Square Park. The announcement concluded: "Assembly at Oak and Michigan is unlawful, a march down Michigan Avenue is unlawful. If you violate the law, you will be arrested . . . ." The CCAWR was handing out flyers encouraging protestors to join the march down Adams and Dearborn to Federal Plaza at 2 p.m.

---

[2]  (...continued)

days in advance (or as soon as practicable if the event is of a spontaneous or urgent nature), to inform the commissioner of the "date, time, location, route, and estimated number of persons participating, so that the city can make any preparations necessary to provide personnel or other city services to minimize the obstruction to pedestrian and other traffic and to otherwise protect the participants and the public." *Id.* at § 10-8-330(r). A public assembly must be allowed unless the commissioner informs the person within two days (or as soon as practicable) "that there would be a . . . significant public safety issue, limited to those set forth for parades . . . ." *Id.* Defendants do not rely on this ordinance to assert that the protestors needed to notify the commissioner of a public assembly, so we do not need to explore the murky waters of the subtle distinctions between a parade and assembly.

Nos. 10-1974 & 10-2064                          9

Lyttle arrived at Oak and Michigan at 11:30 a.m. and Thayer arrived by noon. At that time, there were anywhere between fifty and two-hundred protestors and an estimated two-hundred police officers dressed in riot gear. Officer Killackey read the announcement over a bullhorn three times (11:55 a.m., 11:58 a.m., and 12:02 p.m.). Even though Officer Killackey told protestors gathered at Oak and Michigan that it was unlawful to assemble there, he later testified that he was aware that no permit was needed to hold an assembly or press conference on the sidewalk (as opposed to a "parade" down the street).

Thayer brought a portable amplifier to speak to the crowd. After their arrival, Officer Killackey read the announcement (this was the third time) over the bullhorn and warned the crowd to "start moving," "let's go, gotta move it" or risk arrest. The parties dispute whether the protestors were blocking the sidewalk or traffic. The undisputed evidence shows that the police closed the first lane of traffic on Michigan due to concerns about the safety of pedestrians. A video of the "press conference" shows congestion at the corner, some of which was attributable to police presence, and pedestrian traffic being impeded.

After Officer Killackey's announcement, Bill Massey began speaking on a microphone as some of the crowd started dispersing west on Oak Street in the direction of Washington Square park. Massey stated, "We have been threatened with arrest if we hold this news conference. We are holding it. We will stand up for our rights

if it means—" in the background Officer Killackey said, "time to move, time to move," and Massey continued—"if it means going to jail, we will go to jail." Immediately after Massey's speech, Thayer took the microphone and said, "We have seen in the past, in past unjust war, that when the authorities see the tide turning against them that they respond with attacks on civil liberties, and that is precisely what we are seeing here today. The city of Chicago is clamping down on free speech because people are turning against this war." Thayer spoke for less than thirty seconds before Officer Chiczewski arrested him. Officer Chiczewski said, "That's it, Andy. You're going to jail." Thayer went limp as another officer was trying to handcuff him. As Thayer was being arrested, Detective Madsen told Massey to "step back," but Massey refused. Detective Madsen said, "You are not allowed to be on Oak and Michigan right now," and Massey replied, "I am." Detective Madsen ordered him to disperse, but Massey said he would not. Officer Chiczewski also order Massey to disperse. Massey was not arrested.

The crowd began to disperse. As Thayer was being taken away, Reverend Paul Jakes grabbed the microphone and said: "This is a peaceful rally, this is a peaceful rally, we come today calling for justice, calling for an end to the war. We ask that you do not act violently . . . ." He then spoke and prayed about the injustice of the war for several minutes, undisturbed by the police. Jakes told a police officer that he intended to move west on Oak toward Washington Square Park; he was not arrested. The crowd continued to disperse.

When asked why he did not arrest Massey or Jakes, Officer Chiczewski had little explanation. As to Massey, he testified, "I don't know" and "It was his lucky day." As to Jakes, he testified, "You know what, I was a little busy with Andy at that particular time. I can't tell you why anybody was or wasn't arrested." Officer Chiczewski then testified that he arrested Thayer because he was the organizer of the group and he had previous discussions with Thayer about not assembling at Oak and Michigan.

Officer Killackey directed officers to form a line along the sidewalk of Michigan, move the crowd west on Oak, and not allow protestors to walk southbound on Michigan. After clearing the crowd west on Oak, Officer Killackey returned to the police line along Michigan and ordered the officers to arrest protestors not moving as the line advanced. Non-protestors were allowed to walk south down the sidewalk along Michigan. Officer Chiczewski testified that there was nothing illegal about people walking down Michigan carrying signs, and Officer Killackey testified that people dispersing could leave in any direction, including down Michigan.

By 12:05 to 12:10 p.m., Officer Killackey had cleared enough room at the corner of Oak and Michigan for pedestrians to walk through. Lyttle was holding a sign that said, "End the Occupation of Iraq and Afghanistan." At 12:08 p.m., he attempted to walk south down the Michigan Avenue sidewalk by himself when he came up to the line of officers and was told he could not continue. Lyttle responded, "I think I have the right to do

this, to demonstrate peacefully and walk down Michigan Avenue, and I'd like to proceed." Officer Killackey ordered Officer Shields to arrest him. Lyttle denies that he pushed any officer or blocked the sidewalk. He was standing alone. Lyttle heard Officer Killackey's announcements over the bullhorn but thought they were recommendations and didn't hear anyone say he had to disperse in any particular direction. Lyttle testified, "I was dispersing from the place where I was. I was trying to walk south on Michigan Avenue, which was away from the intersection of Oak and Michigan. So I was dispersing whether . . . I had been ordered to or not."

After the arrests of Thayer and Lyttle, the CPD facilitated the assembly and parade at the alternative location; thousands of protestors engaged in that anti-war demonstration. Thayer and Lyttle were charged with disorderly conduct under subsection (d). Thayer was also charged with resisting arrest. A jury found Thayer guilty of both counts. The state court rejected Thayer's argument that Officer Chiczewski arrested him without probable cause. Thayer was also issued a civil citation for conducting a parade without a permit and at an administrative hearing, the hearing officer rejected Thayer's claim that he was holding a "press conference" at Oak and Michigan. The hearing officer found that a rally was taking place and traffic was blocked on one lane of Oak and one lane of Michigan. He found it to be a "semantical difference" by calling it a "press conference" and it seemed "that what was originally intended way back at the beginning of the permit process that there

was an effort to get that underway." The state court affirmed the administrative decision. Thayer did not appeal either the convictions or the civil citation. Lyttle was acquitted because the court found that he did not have adequate opportunity to disperse.

## II. Discussion

We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. False Arrest and Malicious Prosecution

To prevail on a claim of false arrest, Lyttle must show there was no probable cause for his arrest. *See Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007). "Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). Thayer doesn't raise a similar challenge, having been convicted of this offense, he concedes that he is barred from arguing that officers lacked probable cause for his arrest.

Probable cause exists if "at the time of the arrest, the facts and circumstances within the officer's knowledge . . .

are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). It "requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true." *Mucha v. Vill. of Oak Brook,* 650 F.3d 1053, 1056-57 (7th Cir. 2011). Probable cause "is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). To make this determination, we must "step[ ] into the shoes of a reasonable person in the position of the officer[,]" *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008), considering the facts known to the officer at the time, *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010). This is an objective inquiry; we do not consider the subjective motivations of the officer. *Whren v. United States*, 517 U.S. 806, 810 (1996). Although we have declared subsection (d) unconstitutional, *see Bell*, No. 11-2408, 2012 WL 3892506, an arrest made in good-faith reliance on an ordinance is valid regardless of a subsequent judicial determination of its unconstitutionality, *see DeFillippo*, 443 U.S. at 37-40.

Officers are also afforded an extra layer of protection through the defense of qualified immunity (also known as arguable probable cause). "Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights

of which a reasonable person would have known."
*Fleming v. Livingston Cnty., Ill.,* 674 F.3d 874, 879 (7th Cir.
2012) (quotations omitted). An officer "is entitled to
qualified immunity in a false-arrest case when, if there
is no probable cause, 'a reasonable officer could have
mistakenly believed that probable cause existed.' " *Id.* at
880 (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th
Cir. 1998)); *see also Reher v. Vivo*, 656 F.3d 772, 777 (7th Cir.
2011) (granting qualified immunity to officer who
could have reasonably, but mistakenly, believed that
plaintiff had committed disorderly conduct even though
the information available to the officer at the time was
probably too vague to support an arrest). "[Q]ualified
immunity protects police officers who reasonably
interpret an unclear statute." *Mustafa*, 442 F.3d at 549.

The defendants raised the issue of arguable probable
cause before the district court and the plaintiffs
addressed it (albeit briefly) in their appellants' brief. The
defendants, however, didn't address qualified immunity
on the false arrest claim in their appellees' brief. Though
not raised on appeal, we can "affirm on any ground
supported in the record, so long as that ground was
adequately addressed in the district court and the
nonmoving party had an opportunity to contest the
issue." *Peretz v. Sims,* 662 F.3d 478, 480 (7th Cir. 2011)
(quotations omitted). "[T]he failure of an *appellee* to have
raised all possible alternative grounds for affirming
the district court's original decision, unlike an appellant's
failure to raise all possible grounds for reversal, *should not
operate as a waiver*." *Transamerica Ins. Co. v. South*, 125 F.3d
392, 399 (7th Cir. 1997) (emphasis in original) (quoting

*Schering Corp. v. Ill. Antibiotics Co.*, 89 F.3d 357, 358 (7th Cir. 1996)); *see also Froebel v. Meyer*, 217 F.3d 928, 933 (7th Cir. 2000). We do not find that the plaintiffs will be prejudiced from our consideration of qualified immunity because it was properly raised below, is closely related to the probable cause analysis addressed by both parties on appeal, and is a pure question of law. *See, e.g., Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 968 (9th Cir. 2010).

"A police officer's probable cause determination depends on the elements of the applicable criminal statute." *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010). Section 8-4-010 states: "A person commits disorderly conduct when he knowingly: . . . (d) Fails to obey a lawful order of dispersal by a person known by him to be a peace officer under circumstances where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or alarm." Chi., Ill., Mun. Code § 8-4-010(d). Section 8-4-010(a) identifies conduct that constitutes disorderly conduct, including an act conducted "in such unreasonable manner as to provoke, make or aid in making a breach of peace." *Id.* at § 8-4-010(a); *see also City of Chicago v. Fort*, 262 N.E.2d 473, 475 (Ill. 1970). The disorderly conduct must also be "likely to cause substantial harm or serious inconvenience, annoyance or alarm." *Fort*, 262 N.E.2d at 474. We recently discussed thoroughly each component of this last phrase in *Bell*. *See Bell*, No. 11-2408, 2012 WL 3892506. For this appeal, it is sufficient to note that "annoyance" and

"alarm" do not provide any further limitation on "disor-derly conduct." *See Bell,* 2012 WL 3892506, at *9 (stating that "alarm" is "conjugate with the term 'dis-orderly conduct,'" and annoyance may even be less demanding). This vague language therefore provided officers with discretion to order dispersal when three or more persons in the immediate vicinity were acting disorderly.

Illinois courts have looked to cases interpreting the similar Illinois disorderly conduct statute when con-struing the Chicago ordinance. *Fort,* 262 N.E.2d at 476; *Lester v. City of Chicago,* 830 F.2d 706, 714 n.9 (7th Cir. 1987) ("Illinois courts have treated the Chicago ordinance and the Illinois statutes alike."). The Illinois disorderly conduct statute states that "[a] person commits dis-orderly conduct when he knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace . . . ." 720 ILCS 5/26-1(a)(1);[3] *see also Biddle v. Martin,* 992 F.2d 673, 677 (7th Cir. 1993). "Illinois courts have recognized that 'the types of conduct intended to be included under [the Illinois disorderly conduct statute] almost defy def-inition,'" *Gower v. Vercler,* 377 F.3d 661, 669 (7th Cir. 2004) (quoting *People v. Davis,* 413 N.E.2d 413, 415 (Ill. 1980)); *see also People v. Albert,* 611 N.E.2d 567, 569 (Ill. App. Ct. 1993) (same), but the statute has nonetheless "received a fairly

---

[3] Other aspects of 720 ILCS 5/26-1 and Section 8-4-010 are not similar. For example, the Illinois statute doesn't contain a failure-to-disperse provision similar to subsection (d) of the Chicago ordinance.

well defined gloss," *Sroga v. Weiglen*, 649 F.3d 604, 606 (7th Cir. 2011) (quoting *United States v. Woodard*, 376 F.2d 136, 141 (7th Cir. 1967)); *see also People v. Allen*, 680 N.E.2d 795, 798 (Ill. App. Ct. 1997).

To commit disorderly conduct, "a person must engage in conduct that: (1) is unreasonable; (2) alarms or disturbs another; and (3) threatens to provoke or provokes a breach of the peace." *Reher*, 656 F.3d at 775 (citing 720 ILCS 5/26-1(a)(1)). Illinois courts look to the reasonableness of the conduct in relation to the surrounding circumstances to determine whether a violation of the ordinance has occurred. *City of Chicago v. Mateja*, 372 N.E.2d 1060, 1062 (Ill. App. Ct. 1978). We have recently provided a succinct definition for disorderly conduct, endorsing the definition in Restatement (Second) of Torts § 116 (1965): "[A] public offense done by violence, or one causing or likely to cause an immediate disturbance of public order." *Sroga*, 649 F.3d at 607.

"[S]peech alone cannot form the basis for a disorderly conduct charge." *People v. Rokicki*, 718 N.E.2d 333, 339 (Ill. App. Ct. 1999); *see also People v. Raby*, 240 N.E.2d 595, 598 (Ill. 1968) (stating that "[u]nder no circumstances would the statute allow persons to be punished merely for peacefully expressing unpopular views" (quotations omitted)); *see also People v. Justus*, 372 N.E.2d 1115, 1118 (Ill. App. Ct. 1978) ("[A]busive language does not evolve into a crime simply because persons nearby stop, look and listen."). "It remains no crime to express an unpopular view even if the person expressing those views draws attention to herself or himself or annoys

others nearby." *Rokicki*, 718 N.E.2d at 339. A similar limitation has been placed on the dispersal ordinance. *See City of Chicago v. Weiss*, 281 N.E.2d 310, 315 (Ill. 1972) (noting narrowing construction when situation presents heckler's veto).

The Illinois Supreme Court has upheld disorderly conduct convictions under varying circumstances. For example, in *Weiss*, the court upheld a conviction where officers gave a lawful order to disperse based on their reasonable belief that a group of 3,000 demonstrators, if permitted to move into a densely populated area in which violence had recently occurred, presented a serious threat to the peace and safety of the community. *Id.* at 315. The court explained that "[t]here are circumstances . . . when the first amendment right to assemble and demonstrate in a specific place or area must yield to the compelling interest of the community to maintain peace and order." *Id.* Defendant Weiss attempted to march past the police line despite police orders to disperse. The court rejected Weiss's argument that he was completely disassociated from the other marchers. *Id.* at 316. The court then found the other elements of the ordinance met because at the time the defendants crossed the police line, three or more people in the immediate vicinity were throwing rocks and firecrackers. *Id.* at 316-17.

Illinois courts have similarly upheld convictions under the ordinance when the defendant was in a crowd where others were throwing objects at officers, *City of Chicago v. Greene*, 264 N.E.2d 163, 166 (Ill. 1970); where

the defendant and other demonstrators crossed a police line into a prohibited area (the line had been drawn to protect caulking repairs recently made to a building) and the defendant disobeyed the officer's order to step back, *City of Chicago v. Jacobs*, 263 N.E.2d 41, 43 (Ill. 1970); and where defendants, who were sitting on parked cars that did not belong to them and blocking the entrances to private establishments, failed to disperse, *Fort*, 262 N.E.2d at 474-76. We have also said that "the act of blocking the free flow of pedestrian or vehicular traffic on public ways will support a conviction for the offense of disorderly conduct." *Jones v. Watson*, 106 F.3d 774, 779 (7th Cir. 1997) (Illinois law); *see also Marcavage v. City of Chicago*, 659 F.3d 626, 632 (7th Cir. 2011) (finding probable cause under disorderly conduct statute where protestor obstructed pedestrian traffic along sidewalk).

Lyttle was acquitted of the offense of disorderly conduct, but the question is not whether he violated the ordinance, it's whether an officer at the time could reasonably believe he was committing an offense. To require dispersal under subsection (d), officers had to reasonably believe that three or more persons in the immediate vicinity were causing disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance or alarm. We don't have to decide whether officers had probable cause to arrest, however, because we find that they had *arguable* probable cause to order dispersal and arrest Lyttle for his failure to comply. *See Pearson v. Callahan*, 555 U.S. 223, 235-36 (2009) (holding that we do not need to address whether a constitutional right was violated before addressing whether the right in question was sufficiently well established).

The parties dispute the extent of disruption caused by the protestors at the time Officer Killackey gave the dispersal orders. No threats of violence or civil unrest occurred. No one was attempting to engage in an unpermitted march or parade, no one was inciting the crowd, and by all accounts the demonstration on the public sidewalk was peaceful. On the other hand, the videos submitted by the parties show that the crowd was hindering the flow of pedestrian traffic. The record reveals that there were more than fifty protestors on the plaza and sidewalk area, at a busy intersection in the heart of downtown Chicago. The officers had legitimate reasons to be concerned with the blockage of pedestrian and vehicular traffic and the manner in which the protestors intended to convey their message. *See Cox v. State of Louisiana*, 379 U.S. 536, 554 (1965) (explaining that free speech rights do not give protestors the right to "address a group at any public place and at any time[;] . . . [t]he control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. . . ."). Our review of the video leads us to conclude that an officer could have reasonably (even if mistakenly) perceived the situation as creating a disturbance within the confines of the ordinance. *See Humphrey*, 148 F.3d at 727 (suggesting that the defense of qualified immunity should provide broad protection from suit in the context of an arrest for disorderly conduct).

We further find that although it is questionable whether officers had probable cause to arrest Lyttle, they are nonetheless entitled to qualified immunity. Lyttle denies that he pushed any officer or blocked the side-

22                                    Nos. 10-1974 & 10-2064

walk and at the time he was arrested, there was no in-
dication that other protestors were attempting to
follow him; in fact, most of the protestors had started
dispersing in the other direction, and the sidewalk was
clearing. No city ordinance requires a permit for an
individual to walk down the sidewalk with a protest
sign. Officer Chiczewski and Officer Killacky even
testified that there was nothing illegal about people
walking down Michigan Avenue carrying signs and that
the protestors could disperse in any direction. *Cf. Weiss*,
281 N.E.2d at 315 (officers could order defendant to
disperse in certain direction when attempting to block a
group of 3,000 demonstrators from marching into a
densely populated area). The officers, however, did not
violate clearly established rights of which a reasonable
person would have known. Officers could reasonably
(again, even if mistakenly) believe that based on
their announcements and conduct in forming a line to
advance the crowd west that protestors were
prohibited from breaking through the police line. In
fact, most protestors at the time obeyed by heading
west. Lyttle was part of the group of protestors ordered
to disperse and Officer Killackey could reasonably
believe that Lyttle heard the dispersal order. *Cf. Vodak*,
639 F.3d at 746. When Lyttle attempted to cross the
police line, he was told he could not continue and he
responded that he had the right to proceed. A reasonable
officer under this chaotic and fluid situation could have
believed that Lyttle was failing to follow their orders.
Officers did not have to wait for Lyttle to actually break
through the police line.

Nos. 10-1974 & 10-2064                                    23

At the time of Lyttle's arrest, the officers were still trying to manage the crowd; forming a police line and ordering dispersal toward the permitted location of the march was the most logical way to accomplish this goal. Although certain evidence showed that the CCAWR intended to simply hold a "press conference" at the corner of Oak and Michigan, based on *some* of the flyers and emails circulating, the CPD could be concerned that the protestors intended to turn the "press conference" and "informational rally" into an impermissible march, thus, justifying a directional dispersal. After the crowd was dispersed, nothing prevented Lyttle from returning and peacefully protesting down Michigan Avenue. (In fact, the record suggests that some protestors did just that.) At the time Lyttle was trying to cross the police line, the crowd may have been clearing, but the video still shows congestion at the corner. Under these circumstances, we cannot find that it would have been clear to every reasonable officer that no probable cause existed to arrest Lyttle for disobeying their order. *See Ryan v. Cnty. of DuPage*, 45 F.3d 1090, 1093 (7th Cir. 1995) (quoting *People v. Yocum*, 321 N.E.2d 731, 733 (Ill. App. Ct. 1974)) ("Refusal to obey the lawful order of police may form the basis of a disorderly conduct prosecution.").[4]

---

[4] Because the defendants haven't asserted that there was another basis to arrest Lyttle (for example, obstructing an officer in the performance of his duties, 720 ILCS 5/31-1(a)), we don't address the reasonableness of his arrest on different grounds. *See Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010).

The existence of arguable probable cause to arrest Lyttle is an absolute bar to his § 1983 claim for unlawful arrest and false imprisonment. *See Biddle*, 992 F.2d at 678; *see also Stokes*, 599 F.3d at 626 (Illinois law). In light of our findings of qualified immunity and (as explained below) no retaliatory animus, Lyttle's state law malicious prosecution claim also fails. *See Aleman v. Vill. of Hanover Park*, 662 F.3d 897, 907 (7th Cir. 2011) (Illinois law) (malicious prosecution requires "proof not only of lack of probable cause but also of 'malice'"). Accordingly, we affirm the district court's entry of summary judgment on Lyttle's false arrest and malicious prosecution claims.

## B.  Retaliation under First Amendment

Thayer and Lyttle both assert claims of retaliation for exercising their First Amendment rights. "The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To make out a prima facie case on summary judgment, the plaintiffs must show that: (1) they engaged in activity protected by the First Amendment; (2) they suffered a deprivation that would likely deter First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the police officer's decision. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012); *see also Greene v. Doruff*, 660 F.3d 975, 977-78 (7th Cir. 2011). The plaintiffs undisputedly engaged in First Amendment activity and suffered a deprivation as a result of their

arrests, so the first two elements are met. We focus on causation.

We recently set forth the standard for analyzing causation in *Greene:* a "plaintiff need only show that a violation of his First Amendment rights was a 'motivating factor' of the harm he's complaining of"; once he shows that "the burden shifts to the defendant to show that the harm would have occurred anyway." 660 F.3d at 977 (citing *Spiegla v. Hall*, 371 F.3d 928, 941-43 (7th Cir. 2004)); *see also Brown v. Cnty. of Cook*, 661 F.3d 333, 335 (7th Cir. 2011).

We first discuss Thayer. Assuming he made out a prima facia case, we must decide if taking all the facts and reasonable inferences in his favor, there can be no reasonable dispute that Officer Chiczewski would have arrested him despite any animus toward his protected First Amendment activity. Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus. *See Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011). "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Id; see also Massey v. Johnson*, 457 F.3d 711, 720 (7th Cir. 2006) (summary judgment appropriate where court can say without reservation that a reasonable finder of fact would be compelled to credit the defendant's non-retaliatory explanation). If retaliation is

not the but-for cause of the arrest, "the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Hartman*, 547 U.S. at 260 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "It may be dishonorable to act with an unconstitutional motive . . . but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Id.*

Thayer does not dispute that Officer Chiczewski had probable cause for his arrest. Probable cause, if not a complete bar to Thayer's First Amendment retaliatory arrest claim, provides strong evidence that he would have been arrested regardless of any illegitimate animus. *See Reichle v. Howards*, 132 S. Ct. 2088, 2095-97 (2012); *see also Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) ("[E]vidence of probable cause may act as highly valuable circumstantial evidence that the complained-of conduct would have occurred even without a retaliatory motive.") (quotations omitted). The record shows that Thayer's refusal to disperse, not his speech, was the "but for" cause of his arrest. But even if the record permitted a competing inference in favor of Thayer, Officer Chiczewski is entitled to qualified immunity.

The defendants didn't argue qualified immunity on appeal as to the plaintiffs' First Amendment retaliation claims, but we find it proper to consider this defense for the same reasons we addressed arguable probable

cause above. First, the defendants raised the issue below. Second, the parties' underlying arguments on appeal addressing the unresolved issue of whether probable cause bars First Amendment retaliatory arrests claims is in essence the basis of our qualified immunity finding. Third, the defendants raised their qualified immunity defense on appeal when discussing plaintiffs' related class-of-one equal protection claim. As such, the plaintiffs were aware of the issue and had the opportunity to make arguments in response. Further, even if we remanded, the plaintiffs don't suggest that the defendants are precluded from re-asserting qualified immunity as a defense, *see, e.g., Narducci v. Moore*, 572 F.3d 313, 325 (7th Cir. 2009), which they no doubt would do in light of *Reichle.*

The case law is unsettled on whether probable cause is a complete bar to First Amendment retaliatory *arrest* claims. The Supreme Court has said that it is a bar to retaliatory *prosecution* claims. *See Hartman*, 547 U.S. at 261. We have not resolved the issue, s*ee Hernandez*, 634 F.3d at 915 (citing a 2002 case from this circuit), and other circuits are split, *see, e.g., Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1232 & n.31 (9th Cir. 2006) (setting forth circuit split). After briefing in this case, the Supreme Court granted certiorari on the following two questions: "whether a First Amendment retaliatory arrest claim may lie despite the presence of probable cause to support the arrest, and whether clearly established law at the time of [the plaintiff's] arrest so held." *Reichle*, 132 S. Ct. at 2093. The Court elected to address only the second, concluding that at the time of the plaintiff's

arrest, "it was not clearly established that an arrest supported by probable cause could violate the First Amendment." *Id.*

Based on the Court's decision in *Reichle,* Officer Chiczewski is entitled to qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Id.* A clearly established right is one that is sufficiently clear such that "every reasonable official would have understood that what he is doing violates that right." *Id.* (internal quotations and brackets omitted). As the Supreme Court held in *Reichle,* the "clearly established" standard is not met in this case because neither our circuit nor the Supreme Court has "recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." *Id.*

The Supreme Court in *Reichle* concluded that "[a]lthough *Hartman* involved only a retaliatory prosecution, reasonable officers could have questioned whether the rule of *Hartman* also applied to arrests," and "could have interpreted *Hartman's* rationale to apply to retaliatory arrests." *Id.* at 2095. "*Hartman* injected uncertainty into the law governing retaliatory arrests, particularly in light of *Hartman's* rationale and the close relationship between retaliatory arrest and prosecution claims." *Id.* at 2096-97. Although *Hartman* was issued in 2006 before the plaintiffs' arrest, uncertainty pre-dated *Hartman. See, e.g., Hernandez,* 634 F.3d at 915 (citing a 2002 case*), see also*

*Harman,* 547 U.S. at 255-56. Accordingly, we find that Officer Chiczewski is entitled to qualified immunity and affirm dismissal of Thayer's retaliatory arrest claim.

Lyttle similarly argues that Officers Killackey and Shields arrested him in retaliation for exercising his free speech rights to march down the sidewalk of Michigan Avenue with an anti-war sign. We found that the officers had *arguable* probable cause to arrest Lyttle under subsection (d) and we see no reason to distinguish *Reichle* on that basis. In any event, the record is void of evidence showing that the officers acted with retaliatory animus in arresting him. *See Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir. 2010) (finding no First Amendment retaliation even though officers arrested protestors under an unreasonable, yet mistaken, belief that they were violating Minnesota disorderly conduct statute because the record revealed no retaliatory animus).

Most protestors complied with the dispersal orders and were not arrested even though they were engaging in similar speech. It is true that Lyttle was arrested when attempting to protest down Michigan Avenue, while shoppers and other non-protestors were not so prohibited. Lyttle, however, was part of the disorderly group and thus, subject to the dispersal order. *See, e.g., Bernini v. City of St. Paul,* 665 F.3d 997, 1003 (8th Cir. 2012), *pet. for cert. filed,* 81 U.S.L.W. 3032 (U.S. June 6, 2012) (No. 11-1490) (generally stating that officers have grounds to arrest if they "believe all arrested persons [are] part of the *unit* observed violating the law.") (emphasis in original) (quotations omitted). It was his failure to comply with that

order, not retaliatory animus, that motivated his arrest. We therefore affirm the district court's dismissal of his retaliatory arrest claim.

### C.  Equal Protection Claim

Thayer has also brought a "class-of-one" equal protection claim. "We have held that class-of-one claims can be brought based on allegations of the irrational or malicious application of law enforcement powers." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012). Even though Thayer has asserted a violation of his free speech rights—a fundamental right—we apply the rational basis test to his claims. The plaintiffs only mention heightened scrutiny review in passing, and otherwise, have limited their class-of-one argument to rational basis review.[5]

---

[5] We note that normally unequal treatment on the basis of a fundamental right triggers heightened scrutiny. *See Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 712 (7th Cir. 2002); *see also Vision Church v. Vill. of Long Grove,* 468 F.3d 975, 1000 (7th Cir. 2006) ("Heightened scrutiny . . . is appropriate when government action interferes with a person's fundamental rights, such as freedom of speech or religion."). A true class-of-one case claim, on the other hand, does not implicate fundamental rights. *See Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 911 (7th Cir. 2012) (en banc) (Wood, J., dissenting). At least one circuit has concluded that heightened scrutiny is inapplicable where the conduct doesn't infringe on a *class* of people's

(continued...)

Unfortunately, the class-of-one standard in this circuit is in flux. Thayer must show that he was intentionally treated differently from other similarly situated individuals and that there was no rational basis for this difference in treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Woodruff v. Mason*, 542 F.3d 545, 554 (7th Cir. 2008). But some of our cases also require a showing of improper motive (sometimes referred to as "illegitimate animus"). *See Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010); *see also Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 944 (7th Cir. 2009). Our recent attempt to clarify the standard in *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc) resulted in a tie vote with no controlling opinion. We therefore remain divided over the appropriate standard for a class-of-one equal protection claim against law enforcement personnel.

The plurality opinion in *Del Marcelle* (with a vote from five judges), which happens to be the dissent, proposed the following standard: "(1) plaintiff was the

---

[5]  (...continued)

fundamental rights. *See Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260-61 (6th Cir. 2007) (emphasis added). In other words, the Sixth Circuit has "decline[d] to extend the fundamental rights analysis to classes of one." *Id.* at 261; *see also Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir. 2012). The court in that case explained that "[t]o so extend the fundamental rights analysis would allow the Equal Protection Clause to render other constitutional provisions superfluous." *Scarbrough*, 470 F.3d at 261.

victim of intentional discrimination, (2) at the hands of a state actor, (3) the state actor lacked a rational basis for so signaling out the plaintiff, and (4) the plaintiff has been injured by the intentionally discriminatory treatment." *Id.* at 913 (Wood, J., dissenting).

The "lead" opinion (with a vote from four judges) proposed the following standard: "that the plaintiff be required to show that he was the victim of discrimination intentionally visited on him by state actors who knew or should have known that they had no justification, based on their public duties, for signaling him out for unfavorable treatment—who acted in other words for personal reasons, with discriminatory intent and effect." *Id.* at 889 (Posner, J., lead opinion) (emphasis omitted). A "plaintiff must plead and prove *both* the absence of a rational basis for the defendant's action *and* some improper personal motive (which need not be hostility . . .) for the differential treatment." *Id.* (emphasis in original).

We do not need to decide what standard announced in *Del Marcelle* is correct because we find that Officer Chiczewski is entitled to qualified immunity. As we have already alluded to, this protection gives officers "breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quotations omitted). We do not define clearly established rights at a high level of generality but in a "particularized sense so that the contours of the right are clear to a reasonable

official." *Reichle*, 132 S. Ct. at 2094 (quotations omitted). We ask whether every reasonable officer would have understood that what he was doing violates that right. *See Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011). Although it is not necessary for the plaintiff to identify a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

We initially note that Thayer's class-of-one equal protection claim is seemingly a mere rewording of his First Amendment retaliation claim. Thayer alleges that he was treated differently than the other speakers at the "press conference" because of his political activism. It may be proper to find that the equal protection and First Amendment claims coalesce; thus, requiring that they fall together. *See Vukadinovich v. Bartels*, 853 F.2d 1387, 1391-92 (7th Cir. 1988) (dismissing equal protection claim that constituted "a mere rewording of plaintiff's First Amendment-retaliation claim"). For completeness, though, we address the class-of-one claim separately.

As stated in *Del Marcelle*, "[q]ualified immunity will . . . frequently relieve state actors of the burden of litigation in this area: if discretion is broad and the rules are vague, it will be difficult to show both a violation of a constitutional right and the clearly established nature of that right." 680 F.3d at 915 (Wood, J., dissenting). This is especially true in cases where an officer uses his discretion to choose which, among several violators, to arrest. As the Supreme Court has said:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based

on a vast array of subjective, individualized assess-
ments. In such cases the rule that people should be
'treated alike, under like circumstances and condi-
tions' is not violated when one person is treated
differently from others, because treating like indi-
viduals differently is an accepted consequence of
the discretion granted.

*Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 603 (2008).
Although *Engquist's* holding was confined to the public-
employment context, its reasoning, to some extent,
applies to discretionary law-enforcement decisions. *See
Del Marcelle*, 680 F.3d at 897 (Posner, J.) & 912 (Wood, J.,
dissenting).

   Officer Chiczewski could not target Thayer because of
his speech, but he could target Thayer for his unprotected
conduct—i.e., his role in organizing an assembly that
turned disorderly and subsequent refusal to disperse
when ordered. Officer Chiczewski testified that due to
concerns about the size of the crowd and blockage of
pedestrian and vehicular traffic, he told Thayer not to
assemble at Oak and Michigan. After officers deter-
mined that three or more people were engaged in acts of
disorderly conduct at the corner, they ordered dispersal.
Thayer does not dispute that the officers had probable
cause to do so. An officer, acting pursuant to his public
duties, is given discretion to determine how best to effectu-
ate a lawful order. Officer Chiczewski had a legitimate
police objective in arresting Thayer to more rapidly and
efficiently disperse the disruptive crowd. After
Thayer's arrest, the crowd began to disperse and Officer

Chiczewski's attention was on Thayer, not the other speakers.

Even considering all the facts in favor of Thayer, we cannot conclude that every reasonable officer would have understood that by arresting Thayer, the perceived "chief" of the group, and not Massey and Jakes that Officer Chiczewski was violating Thayer's right to equal protection. *Cf. Geinosky*, 675 F.3d at 745 (plaintiff stated class-of-one claim where defendants allegedly cited plaintiff for twenty-four bogus parking tickets) and *Hanes v. Zurich*, 578 F.3d 491, 492-96 (7th Cir. 2009) (defendants not entitled to qualified immunity where plaintiff alleged that defendants arrested him eight times on charges later dropped for no reason other than malicious intent). Given the uncertainly in the law and the unique factual situation at issue here, the constitutional question was not beyond dispute. *See, e.g., Lunini v. Grayeb*, 395 F.3d 761, 772 (7th Cir. 2005) (defendants entitled to qualified immunity where ordinary police officer could not have known that failure to arrest councilman would violate equal protection). Rather, a reasonable officer could have believed that arresting Thayer was the most effective way to gain compliance with the dispersal order.

### D.  Constitutionality of Subsection (d)

Lyttle has mounted an attack on the facial validity of subsection (d) asserting both an overbreadth and vagueness challenge and seeking an injunction against its prospective enforcement. (The district court held that

Thayer's facial challenge was barred by res judicata; Thayer doesn't appeal that ruling.). In light of our recent opinion partially invalidating subsection (d), *see Bell*, 2012 WL 3892506, Lyttle's claim seeking a declaration and an injunction in that respect is moot. *See, e.g., Eagle Books, Inc. v. Difanis*, 873 F.2d 1040, 1042 (7th Cir. 1989) (claim moot where state supreme court declared statute unconstitutional); *see also Miller v. Benson*, 68 F.3d 163, 165 (7th Cir. 1995) (amendment of statute mooted claim); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (claim moot where statute repealed); *Longley v. Holahan*, 34 F.3d 1366, 1367 (8th Cir. 1994) (claim moot where statute declared unconstitutional in companion case).

### III. Conclusion

We AFFIRM the district court's entry of summary judgment in favor of the defendants on Lyttle's false arrest and malicious prosecution claims, on Lyttle's and Thayer's First Amendment retaliation claims, and on Thayer's class-of-one equal protection claim. We DISMISS Lyttle's facial challenge to subsection (d) as moot.